James M. Fidler v. Commissioner.
Fidler v. Commissioner
Docket No. 27910.
United States Tax Court
1952 Tax Ct. Memo LEXIS 30; 11 T.C.M. (CCH) 1128; T.C.M. (RIA) 52332; November 21, 1952
Nelson Rosen, Esq., 6253 Hollywood Blvd., Los Angeles, Calif., for the petitioner. W. Lee McLane, Esq., for the respondent. RAUM
*31 Memorandum Findings of Fact and Opinion Respondent determined deficiencies in the income tax of petitioner as follows: Year
Deficiency
1944
$ 7,316.60
1945
10,293.79
1946
6,992.74
The questions involved are: (1) Whether the respondent erred in disallowing as deductions payments of $9,000, $9,600 and $9,600 made by petitioner to his divorced wife during the years 1944, 1945 and 1946, and (2) whether the respondent erred in determining that a loss of $4,750, resulting from the sale by petitioner in 1945 of certain books and manuscripts, was a long-term capital loss subject to the provisions of Section 117(b) and (d) of the Internal Revenue Code. Findings of Fact Part of the facts have been stipulated, and these stipulated facts are incorporated herein by reference. Petitioner is a resident of Los Angeles, California. He filed his income tax returns for the calendar years 1944, 1945 and 1946 with the collector of internal revenue for the sixth district of California at Los Angeles. In 1936 petitioner was married to Ruth Law Fidler, sometimes known as Roberta Law Fidler and Roberta L. Fidler (hereinafter referred to as "Ruth Fidler"). There was no *32 issue of this marriage, and in 1942 petitioner and Ruth Fidler adopted a newly-born baby girl. Thereafter, petitioner and Ruth Fidler became separated, and on August 20, 1943, they entered into a written agreement which provided, among other things, that petitioner should have the exclusive custody and control of the minor child, subject to Ruth Fidler's right to reasonable visitation; that upon the execution of the agreement, Ruth Fidler should receive, as her share and in full division of the property of the parties, a certain Packard automobile and $20,000 in cash or securities; and that, in addition thereto, petitioner would pay to Ruth Fidler, in full and final payment for her support, maintenance and alimony, the sum of $30,000 in monthly installments of $500 per month, commencing on September 1, 1943. Petitioner's obligation to make such payments at the rate of $500 per month to Ruth Fidler for her support and maintenance was evidenced by two promissory notes executed by petitioner and delivered to her, concurrently with the execution of said agreement, and the terms of the notes were set forth in full in said agreement. One of the notes provided for the payment to Ruth Fidler *33 of the sum of $18,000, payable in consecutive, monthly installments of $500 per month commencing on September 1, 1943. The second note provided for the payment of the sum of $12,000, payable in consecutive, monthly installments of $500 per month, commencing on October 1, 1946. Each note contained a provision that in the event petitioner defaulted in the payment of any installment when due, the whole note might become immediately due and payable at the option of Ruth Fidler or the holder thereof, and that should suit be commenced to enforce payment of the note, petitioner agreed to pay such additional sums as attorney's fees as the court might adjudge to be reasonable. The $12,000 note, only, contained the following additional provision: "This promissory note is given by the undersigned to the payee in accordance with an Agreement executed by and between the parties this date, for the support and maintenance of the payee. This note shall become absolutely void and of no effect upon any remarriage of the payee and whether or not such remarriage shall be valid." The agreement of August 20, 1943, was prepared by a firm of Los Angeles attorneys who represented Ruth Fidler. On October 21, 1943, an *34 amendment to the agreement of August 20th was executed by petitioner and Ruth Fidler, the effect of which was to eliminate the provision abovequoted appearing in the $12,000 note, and Ruth Fidler acknowledged receipt of the $12,000 note, as thus amended, and also the $18,000 note above referred to. On December 16, 1943, the aforesaid agreement was again supplemented and amended to provide, in effect, that Ruth Fidler should have exclusive custody and control of the minor child of the parties for a period of six months during each year and that petitioner should have the exclusive custody and control of the child for a like period of six months during each year; and that during such times as Ruth Fidler should have the custody and control of the child petitioner would pay the costs of a nurse, food, clothing and medical expense for the child. On February 4, 1944, the petitioner and Ruth Fidler entered into a new agreement, which superseded their previous agreements. This new agreement also made provision for the custody and support of the minor child of the parties, and settled all rights and claims in respect of property and support between the parties. It, in substance, provided *35 among other things that each of the parties should have the exclusive custody and control of their minor child for six months during each year, and that petitioner would pay to Ruth Fidler for the care, support and maintenance of the child during the period that she should have its custody and control the sum of $200 per month as well as any extraordinary medical care and attention required for the child; that in addition to the Packard automobile and $20,000 in cash or securities theretofore transferred by petitioner to Ruth Fidler as her share of and in full division of the property of the parties, petitioner agreed to and did transfer to her an additional sum of $7,000 in cash or securities. In addition to the foregoing, and with respect to alimony, support and maintenance for Ruth Fidler, the agreement provided as follows: "SEVENTH: In addition to the foregoing, and on account of full and final payment of maintenance and support, alimony and alimony pendente lite to Second Party, and counsel fees and costs in any pending or future action between the parties hereto, First Party does hereby re-delive to Second Party, and Second Party will retain, those two (2) certain promissory *36 notes, being the same notes described in Paragraph First of Amendment to Agreement of August 20, 1943, in words and figures as follows, to-wit: * * *" After setting forth, verbatim, the terms of the two promissory notes hereinbefore referred to, as amended on October 21, 1943, the agreement goes on to provide for additional payments in the form of a third promissory note as follows: "In addition to the foregoing and in full and final payment of maintenance and support, alimony and alimony pendente lite to Second Party, and counsel fees and costs in any pending or future action between the parties hereto, First Party will, upon the execution of the within instrument, make, execute and deliver unto Second Party one (1) promissory note, in words and figures as follows, to-wit: $16,200.00 Los Angeles, California
February 4, 1944 "At the time stated after date, for value received, I promise to pay to ROBERTA L. FIDLER, only at Los Angeles, California, the sum of Sixteen Thousand, Two Hundred ($16,200.00) Dollars, without interest. Principal payable in lawful money of the United States. This note is payable in installments of Three Hundred ($300.00) Dollars each month, payable *37 upon the first day of each and every calendar month subsequent to the first day of March, 1944, and any default in the payment of any installment when due shall cause the whole note to become immediately due and payable at the option of said ROBERTA L. FIDLER. Should suit be commenced to enforce the payment of this note, I agree to pay such additional sum as the Court may adjudge reasonable as attorney's fees in said suit. Demand, presentment for payment, protest and notice of protest are hereby waived. "This promissory note is given by the undersigned to the payee in accordance with an Agreement executed by and between the parties this date, on account of the support and maintenance of the payee. Should payor, at any time during the term hereof, not have a radio contract under the terms of which he receives a monthly sum equal to the monthly sum he is now receiving under his present radio contract, the monthly installments falling due hereunder during said periods shall be reduced in proportion to the amount of the reduction of his present radio contract, and should payor have no radio contract at all, then all monthly installments falling due hereunder during said period, shall *38 be waived by payee, and payor shall not be required at any future time to pay the balance of any reduced, or waived payments, hereunder. JAMES M. FIDLER James M. Fidler 4362 Clybourne Avenue Burbank, California
"That Second Party accepts said three (3) promissory notes, for her support and maintenance and not in lieu of property rights, upon the following conditions: (a) In lieu of other provision for the support and maintenance of Second Party during her natural life; "(b) In full payment, discharge and satisfaction of all obligations or any thereof, on the part of First Party to maintain or support Second Party during her natural life; "(c) In full payment, discharge and satisfaction of counsel fees and costs in any pending or future action between the parties hereto, other than an action on said or any of said promissory notes. "EIGHTH: That the installment payments provided in the three (3) promissory notes hereinabove set forth, being taxable to her as income, Second Party will, from and after the date hereof, file such income tax returns and/or declarations, both Federal and State, as are required by law, and will include therein all such support and maintenance *39 payments received by her, and will pay all taxes shown to be due and payable under such returns and/or declarations. "Should any of the monthly installments provided for in the said $16,200.00 promissory note, last above described, be reduced or waived and the payor not be required to make same, First Party will give to Second Party, not for her support and maintenance, but as an absolute gift without condition, sufficient moneys to enable Second Party to pay her income taxes, both Federal and State, when due, on support and maintenance payments received from First Party, but not on income received by Second Party in excess thereof, without resort to the support and maintenance payments provided for in the two other promissory notes, above described, it being the intention of the parties hereto that Second Party will, during any period that the payments under said promissory note last above described are reduced or waived, have a net minimum sum of $500.00 per month for her support and maintenance." In the preparation and execution of the agreement of February 4, 1944, petitioner and Ruth Fidler were each represented by attorneys of Los Angeles, California. At the time of the *40 execution of the agreement and for several years prior thereto, petitioner's principal business or occupation was that of radio commentator and newspaper columnist. The "present radio contract" referred to in the agreement of February 4, 1944 (and in the amended decree of divorce hereinafter referred to) was a contract which was in force on February 4, 1944, and March 20, 1944, between petitioner and the sponsor of a weekly radio broadcast program under which petitioner was engaged to render his services as a commentator and reporter on said weekly radio program. The term of the radio contract was 26 weeks. The sponsor, however, had the option to renew and extend the contract of employment for additional, successive terms of 26 weeks' duration. In 1944 Ruth Ridler, as plaintiff, instituted an action in the District Court of the State of Nevada in the County of White Pine against petitioner, as defendant, wherein she prayed that she be granted a divorce from petitioner and that the agreement of settlement and separation aforesaid of February 4, 1944, be approved by the court. Ruth Fidler was represented in said action by a firm of attorneys of Las Vegas, Nevada. Petitioner *41 never personally appeared in the Nevada divorce action, but authorized an attorney of Ely, Nevada, to appear for him. The divorce action was tried at Ely, Nevada, on March 20, 1944, and a decree of divorce was rendered in favor of Ruth Fidler against petitioner. The formal decree of divorce as signed by the judge of the court adjudged and ordered as follows: "NOW, THEREFORE, it is hereby ORDERED, ADJUDGED AND DECREED that the marriage relationship now and heretofore existing between plaintiff and defendant be and the same is hereby dissolved and the parties are restored to the status of single persons. "IT IS FURTHER ORDERED, ADJUDGED AND DECREED that that certain Settlement Agreement entered into between the parties, dated February 4, 1944, be and the same is hereby confirmed, ratified, approved and adopted as a part of this Decree. "IT IS FURTHER ORDERED, ADJUDGED and DECREED that the defendant herein have the care, custody and control of the minor child, named BOBBE FIDLER, JR., until October 1, 1944, and thereafter the plaintiff is to have the custody of the child for the next ensuing six months, or until April 1, 1945; thereafter the custody of said child shall be distributed *42 to the parties for six months each, until further order of this Court; that during the term plaintiff has custody of the said minor child, defendant shall pay to her for the care, support and maintenance of said child, the sum of TWO HUNDRED ($200.00) DOLLARS per month. "IT IS FURTHER ORDERED, ADJUDGED and DECREED that the defendant shall pay to the plaintiff, in accordance with the terms of said Settlement Agreement, the sum of EIGHT HUNDRED ($800.00) DOLLARS per month, commencing forthwith and continuing for a period of five years. "The Court herewith retains jurisdiction herein with reference to the said minor child for the purpose of making such orders as may hereafter appear to best serve the interest of said minor child. "DATED and DONE this 20th day of MARCH, 1944. "HARRY M. WATSON District Judge The decree was inconsistent and ambiguous, in what while it "confirmed, ratified, approved and adopted as a part" of it the settlement agreement entered into between petitioner and Ruth Fidler on February 4, 1944, and ordered petitioner to make payments to Ruth Fidler "in accordance with the terms of said Settlement Agreement", it also provided that such payments should be *43 "the sum of EIGHT HUNDRED ($800.00) DOLLARS per month, commencing forthwith and continuing for a period of five years". When the Los Angeles attorney who had represented petitioner in the preparation of the settlement agreement of February 4, 1944, received a copy of the above decree, he immediately noted the inconsistency of its provisions and communicated with Ruth Fidler's attorneys in Las Vegas, Nevada, concerning it, and suggested that the decree be amended to reflect correctly the terms of the settlement agreement. The inconsistency in the decree was due to inadvertence, and Ruth Fidler's attorneys agreed that the decree should be amended. A form of amended decree was prepared, and on September 11, 1944, Ruth Fidler's attorneys sent such form of amended decree to the attorney at Ely, Nevada, who had appeared for petitioner in the divorce action, and requested him to present the proposed amended decree to the court. Thereafter, on September 18, 1944, upon application of the attorney, the court ordered that the decree of divorce be amended to recite correctly the terms and provisions of the agreement of settlement between petitioner and Ruth Fidler. An amended decree, as *44 filed on November 16, 1944, contained the exact terms and language as set forth in the original decree above-quoted except that the following paragraph was deleted: "IT IS FURTHER ORDERED, ADJUDGED and DECREED that the defendant shall pay to the plaintiff, in accordance with the terms of said Settlement Agreement, the sum of EIGHT HUNDRED ($800.00) DOLLARS per month, commencing forthwith and continuing for a period of five years" and in lieu thereof the following paragraphs were substituted: "IT IS FURTHER ORDERED, ADJUDGED and DECREED, that defendant shall pay to plaintiff in accordance with the terms of said Settlement Agreement the sum of Eight Hundred ($800.00) Dollars per month commencing forthwith and continuing for a period of four years and five months, the last monthly payment becoming due and payable on August 1, 1948, providing, however, that should defendant, at any time before August 1, 1948. not have a radio contract under the terms of which he receives a monthly sum equal to the monthly sum he is now receiving under his present radio contract, monthly payments to the extent of the sum of Three Hundred ($300.00) Dollars of said sum of Eight Hundred ($800.00) Dollars *45 per month, shall be reduced in proportion to the amount of the reduction of his present radio contract, and should defendant have no radio contract at all, between the date hereof and said August 1, 1948, then monthly payments to the extent of the sum of Three Hundred ($300.00) Dollars per month of said sum of Eight Hundred ($800.00) Dollars per month, shall be waived and shall not be made to plaintiff by defendant, and defendant shall not be required at any future time to pay to plaintiff the balance of any reduced, or waived, payments hereunder. "IT IS FURTHER ORDERED, ADJUDGED and DECREED, that all executory provisions of said Settlement Agreement which are not incorporated in this Decree in a plenary manner, are hereby declared to be binding on the respective parties hereto, and each of said parties is hereby ordered to do and perform all acts and obligations required to be done or performed by said executory provisions of said Settlement Agreement." The amended decree was dated and signed by the same judge who had tried the divorce action and signed the original decree, in the following fashion: "DATED and DONE this 20th day of MARCH, 1944. /s/ HARRY M. WATSON District *46 Judge" On and prior to March 20, 1944, petitioner had paid and transferred to Ruth Fidler all moneys and properties due to her under the terms of the settlement agreement of February 4, 1944, had paid certain sums required to be paid to her attorneys for representing her, and had made all payments to her which had then become due and payable to her pursuant to the terms of the promissory notes referred to and described in the agreement. After March 20, 1944, and during the years 1944, 1945 and 1946, petitioner also paid Ruth Fidler all sums which he was obligated to pay to her under the terms of the settlement agreement and the decree of divorce for the care, support and maintenance of the minor child of the parties. In addition to the foregoing, petitioner, pursuant to the terms of the agreement and decree, paid to Ruth Fidler as alimony and for her support and maintenance the sum of $800 each month during the period commencing April 1, 1944, and ending December 31, 1946. The divorce decree as amended remained in full force and effect during the years 1945 and 1946. During the period from February 4, 1944, to December 31, 1946, the sponsor of the weekly radio broadcast program *47 hereinbefore referred to, to whom petitioner was under contract on February 4, and March 20, 1944, exercised its option to renew and extend said contract with the result that petitioner was continuously employed by this sponsor during this period and received, under the contract and the renewals and extensions thereof, monthly compensation equal to the monthly compensation which he had been receiving under said radio contract on February 4 and March 20, 1944. On his income tax return for the calendar year 1944, petitioner claimed deductions in the sum of $9,000 by reason of alimony payments made to Ruth Fidler during said year. Of this sum, $1,800 was paid by petitioner prior to the rendition of the decree of divorce on March 20, 1944, and at the trial of this proceeding, petitioner conceded that such sums aggregating $1,800 paid prior to the decree of divorce would not be properly deductible by him. In his income tax returns for the calendar years 1945 and 1946 petitioner claimed deductions in each year in the sum of $9,600 by reason of the alimony payments made to Ruth Fidler during those years. Respondent, in his notice of deficiency, disallowed the deductions claimed in each *48 year upon the ground that "said amounts do not qualify as proper deductions under the provisions of section 23(u) of the Internal Revenue Code". In the year 1937, petitioner acquired by assignment and transfer from William N. Selig a stock of literary properties consisting of all of Selig's literary rights, motion picture rights and other property rights, of every kind and nature, in approximately seventy-five published novels and stage plays, and approximately 2,000 original manuscripts, scenarios, and motion picture shooting scripts. Petitioner paid Selig $5,000 for these properties. A Mr. Bentel, who was a literary agent and friend of petitioner, induced petitioner to buy the literary properties. Bentel advised petitioner that Selig was in failing health and was willing to sell these properties at what Bentel considered to be a reasonable price because among them were some properties which Bentel believed were quite good and which might be sold to motion picture studios at a profit. Petitioner had an oral understanding with Bentel that Bentel would conduct a campaign to sell the stories, books, or plays, and that after petitioner recouped his $5,000 investment *49 from such sales, he and Bentel would thereafter divide the returns on a "fifty-fifty" basis. After the literary properties were acquired, a tabulation was made of them, and they were placed on display in the offices of Bentel. Petitioner purchased the literary properties with the intention of attempting to sell some of them at a profit. They were not purchased for use in his work as a commentator or columnist, and none of them was ever used in such work. No sale of any of the literary properties was consummated prior to 1945, although at one time petitioner and Bentel thought a studio was going to purchase a book entitled "Under Two Flags". In 1945, petitioner sold all of the literary properties acquired from Selig for $250, to Eric Ergenbright, who was, and had been, an employee of petitioner for many years. In his income tax return for the year 1945, petitioner claimed a deduction in the amount of $4,750 as an ordinary loss. In determining the deficiency the respondent disallowed the claimed deduction stating that the "ordinary loss claimed of $4,750.00 from sale of Selig Library of books and manuscripts has been determined to be a loss from the sale of capital assets held *50 for more than six months and subject to the provisions of section 117(b) and (d) of the Internal Revenue Code." Opinion RAUM, Judge: 1. Petitioner seeks to deduct the payments of $800 a month made by him to his divorced wife, Ruth Fidler, in accordance with the divorce decree and the agreement between them adopted as part of the decree. Section 23(u) of the Internal Revenue Code[1] allows a divorced husband to deduct payments made by him to his divorced wife which are includible in her gross income under Section 22(k). [2] The issue herein is whether the payments in controversy were "installment payments discharging a part of an obligation the principal sum of which is, in terms of money or property, specified in the decree or instrument" incident to such decree. If they were such "installment payments", then they are not taxable to the divorced wife as income under Section 22(k), nor are they deductible by the husband under Section 23(u). *51 The question is not novel, and prior decisions of this Court are dispositive of the present controversy. The monthly payments herein could not cover a period in excess of five years, and it is but a matter of simple arithmetic to add either the payments themselves or the face amounts of the three notes embodying the obligation in respect of such payments, in order to determine the principal sum of the obligation. Thus, whether the "principal sum" is explicitly set forth, or whether it is determinable by elementary arithmetic processes, our decisions are clear that such payments are "installment payments" within the meaning of Section 22(k). J. B. Steinel, 10 T.C. 409; Frank R. Casey, 12 T.C. 224; Estate of Frank P. Orsatti, 12 T.C. 188; Harold M. Fleming, 14 T.C. 1308; Joseph D. Fox, 14 T.C. 1131; William M. Haag, 17 T.C. 55; Jean Cattier, 17 T.C. 1461; and F. Ellsworth Baker, 17 T.C. 1610. And it is equally clear that the same rule applies even though the obligation of the husband is not absolute and can be discharged upon the happening of a contingency. J. B. Steinel, supra, at p. 412; *52 Estate of Frank P. Orsatti, supra, at p. 191. Accordingly, it is of no consequence here that petitioner's obligation to the extent of $300 a month could have been cut down in the event that he did not have a radio contract at a later time providing him with the same compensation then enjoyed by him. That contingency did not in fact occur during the taxable years, and it could not detract from the existence of the "obligation" or from the ascertainability of the "principal sum" referred to in Section 22(k). Such is the plain import of the Steinel and Orsatti decisions. Petitioner relies upon John H. Lee, 10 T.C. 834, and Roland Keith Young, 10 T.C. 724. These decisions were also relied upon by the petitioners in the Orsatti case, and we held that they "are distinguishable upon the terms of the instruments" involved therein. 12 T.C. at p. 192. In those cases the amounts of the payments were geared to income of the divorced husband that was clearly of a fluctuating character, and it was not thought to be reasonably possible to spell out a principal sum of an obligation. The decisions in those cases must be regarded as resting upon *53 the special facts presented therein. We hold that the payments made by petitioner to Ruth Fidler during the taxable years are installment payments within the meaning of Section 22(k), and are not deductible by petitioner in computing his net income for the taxable years under Section 23(u). 2. The remaining issue relates to the loss of $4,750 sustained by petitioner upon the sale in 1945 of the books and manuscripts he acquired from Selig. The petitioner contends that the respondent erred in treating the loss sustained as a long-term capital loss from the sale or exchange of "capital assets"; that the literary properties sold fell within those types of property which were expressly excluded from "capital assets" in Section 117 (a) (1), i.e., "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *;" and that the loss was an ordinary business loss deductible in full under the provisions of Section 23(e). Section 23(e) provides that in computing net *54 income of individuals there shall be allowed as deductions losses sustained during the taxable year (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with trade or business. Section 23(g) provides that losses from sales of capital assets shall be allowed only to the extent provided in Section 117. [3]
*55 Petitioner bought the literary properties in question from William N. Selig in 1937 and sold them in 1945. During that eight-year period he never consummated a sale of any of them. While he testified that he and Bentel made efforts to sell various books and stories to some of the motion picture studios, when asked on cross-examination to name some of the prospects approached regarding their sale, he replied: "A. I don't know that I could specify with stories, to which studios. There were several stories involved, several books involved, and some of them were hot and some were cold. One in particular that was hot, that we thought was sold, was a book called 'Under Two Flags'. I believe that was the title. "The book called 'Under Two Flags', Mr. Bentel and I both believed that the sale - and I think the sale was to have been to RKO, we both believed the sale was in the bag. About that time another studio made a motion picture, which they titled 'Under Two Flags', and it kayoed, or whatever you want to call it - it stopped our sale." It is upon such evidence that the petitioner relies to show that he was engaged in trade or business with respect to the literary properties. We *56 are satisfied on the record before us that petitioner's only business or occupation was that of radio commentator and newspaper columnist. He did not purchase the literary properties for use in that business. While it is true that an individual may engage in more than one business, he has not established that he did so. He made an investment in the literary properties with the hope or expectation of selling them at a profit. That hope or expectation was never realized during the period from 1937 to 1945. The only sale of any of these properties ever made by him was the sale in 1945 to one of his employees. He may have held them for sale, but not "primarily for sale to customers in the ordinary course of his trade or business." He did not or could not show any activity from which we can find that he engaged in a trade or business with respect to the literary properties. Neither did he show that these properties constituted stock in trade or property of a kind which would properly be included in inventory. See Section 22(c), Internal Revenue Code. The properties in which he invested were held by him for more than six months, and inasmuch as he has not proved that *57 they fell within the types of property excluded from the term "capital assets" in Section 117 (a) (1), the respondent did not err in determining that the loss sustained upon their sale was a loss from the sale of capital assets and subject to the provisions of Section 117 (b) and (d). Had petitioner sold the literary properties at a profit, he would no doubt have claimed that they were capital assets and that he would have been entitled to the favorable treatment accorded to capital gains. We think that these properties did constitute capital assets, and that petitioner must accept whatever tax disadvantages attach to such assets when they are sold at a loss. Decision will be entered for the respondent. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(u) Alimony, Etc., Payments. - In the case of a husband described in section 22 (k), amounts includible under section 22 (k)↩ in the gross income of his wife, payment of which is made within the husband's taxable year. * * * 2. SEC. 22. GROSS INCOME. * * *
(k) Alimony, Etc., Income. - In the case of a wife who is divorced or legally separated from her husband under a decree of divorce or of separate maintenance, periodic payments * * * received subsequent to such decree in discharge of, * * * a legal obligation which, because of the marital or family relationship, is imposed upon or incurred by such husband under such decree or under a written instrument incident to such divorce or separation shall be includible in the gross income of such wife, * * * Installment payments discharging a part of an obligation the principal sum of which is, in terms of money or property, specified in the decree or instrument shall not be considered periodic payments for the purposes of this subsection; except that an installment payment shall be considered a periodic payment for the purposes of this subsection if such principal sum, by the terms of the decree or instrument, may be or is to be paid within a period ending more than 10 years from the date of such decree or instrument, but only to the extent that such installment payment for the taxable year of the wife * * * does not exceed 10 per centum of such principal sum. * * *↩
3. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), or real property used in his trade or business; * * *
(5) Long-Term Capital Loss. - The term "long-term capital loss" means loss from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such loss is taken into account in computing net income; * * *
(b) Deduction From Gross Income. - In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 per centum of the amount of such excess shall be a deduction from gross income. * * *
(d) Limitation Capital Losses. - * * *
(2) Other Taxpayers. - In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer or $1,000, whichever is smaller. For purposes of this paragraph, net income shall be computed without regard to gains or losses from sales or exchanges of capital assets. If the tax is to be computed under Supplement T, "net income" as used in this paragraph shall be read as "adjusted gross income."↩